IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 12-418-2 |
| | : | |
| MARLON GRAHAM | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                                                        **August 21, 2014**

By Order of August 11, 2014, this Court denied Defendant Marlon Graham's nunc pro tunc motion to dismiss the indictment in this case based upon outrageous government conduct. The purpose of this Memorandum is to summarize the basis for the Court's ruling.

In May 2013, a jury convicted Graham and four codefendants of federal offenses relating to their involvement in a planned robbery of a purported drug stash house from which they believed at least ten kilograms of cocaine could be stolen.[1] The convictions were the product of a reverse sting operation by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), in which an undercover ATF agent posed as a drug courier looking to recruit a team to rob an alleged Philadelphia drug stash house of which he claimed to have inside knowledge. In fact, the stash house and cocaine were entirely fictitious, and when the Defendants assembled for the robbery on the morning of July 18, 2012, they were arrested.

---

[1] Graham and the four codefendants who went to trial were convicted of five counts: (1) conspiracy to commit robbery which interferes with interstate commerce, (2) attempted robbery which interferes with interstate commerce and aiding and abetting, (3) conspiracy to possess with intent to distribute five kilograms or more of cocaine, (4) attempted possession with intent to distribute five kilograms or more of cocaine and aiding and abetting, and (5) carrying, and aiding and abetting the carrying of, a firearm during and in relation to a crime of violence and a drug trafficking crime.

As Graham notes in his motion papers, he was not the target of the reverse sting. Rather, ATF was originally investigating another individual who it had reason to believe was involved in home invasion robberies. According to the undercover agent, well before initiating the sting operation in this case, ATF had developed information that the original target had committed home invasion robberies along with Robert Lamar Whitfield, one of Graham's codefendants. *See* Trial Tr. 2.59-2.60, May 14, 2013. After the confidential informant (CI) assisting ATF lost contact with the original target, the CI attempted to reestablish contact through Whitfield, who expressed interest in the robbery opportunity the CI intended to present to the original target. Whitfield thereafter became the sting's target, and he eventually brought Graham into the conspiracy.

On July 1, 2014, Graham filed a nunc pro tunc motion to dismiss the indictment on the basis that the Government's conduct with respect to the reverse sting operation was so outrageous as to violate his due process rights.[2] Graham argues the Government's conduct was outrageous because the Government manufactured the crime in its entirety, inventing the fictitious stash house that was the target of the robbery, the quantity of cocaine purportedly available therein, the date and time the cocaine would be present in the house, the number of individuals who would be guarding the cocaine, and the guards' possession of one or more firearms. The Government also provided material support for the robbery, including a "staging area" for the robbers to assemble and a van. Graham maintains the Government's selection of the quantity of drugs likely to be in the stash house—ten kilograms or more of cocaine— amounted to economic coercion given the Defendants' financial circumstances and the street value of the drugs. He also contends that by creating the stash house scenario, the Government

---

[2] On June 27, 2014, the Court granted Graham leave to file the above-referenced motion to dismiss the indictment nunc pro tunc, as the post-verdict motions deadline had passed.

2

provided the basis of the robbery plan, including the need for firearms to contend with the armed guards who allegedly would be inside the stash house.  Graham further notes the Government had no knowledge of his criminal history or suspicion that he was involved in other criminal activity, much less other stash house robberies, at any time before he was arrested on the morning the proposed robbery was to take place.

On July 8, 2014, a week after Graham filed his outrageous government conduct motion, this Court denied a similar request filed by Whitfield, who urged the Court to follow *United States v. Hudson*, No. 13-126, 2014 WL 960860 (C.D. Cal. Mar. 10, 2014), in which a district court in California granted a defendant's pre-trial motion to dismiss an indictment based on outrageous government conduct in the context of a similar ATF reverse sting operation. Although recognizing certain similarities between the sting operations in *Hudson* and in this case, this Court found the sting in this case distinguishable on numerous grounds.  In particular, the Court relied on the fact that in selecting targets for the sting in this case, ATF chose individuals who it believed had been involved in other home invasion robberies and selected Whitfield only after he affirmatively sought the opportunity for himself.  The Court also relied on the fact that Whitfield was actively involved in planning the robbery and was a willing participant in the scheme.  The Court acknowledged the value of the drugs involved in the scheme may have motivated the sting targets, but concluded ATF's selection of the drug quantity did not rise to the level of a due process violation because ATF had a reasonable basis for selecting the ten-kilogram quantity it used.  *See* Trial Tr. 2.69-2.71, May 14, 2014 (stating ATF selected the drug quantity in this case in consultation with the Drug Enforcement Administration and Philadelphia Narcotics based on the quantities those agencies were seeing in the Philadelphia region so as to ensure the stash house scenario would be believable).

In addition to distinguishing this case from *Hudson*, the Court also found this case distinguishable from *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), the only case in which the Third Circuit has applied the doctrine of outrageous government conduct to bar a prosecution. Whereas in *Twigg*, government actors not only concocted but also conducted the entire illicit scheme (in that case a setting up a speed lab, a task the defendants lacked the know-how to complete on their own), here, the presentation of phony stash house scenario to Whitfield and his associates (who readily participated to varying degrees in planning and making preparations for the robbery) did not involve a level of overreaching that "violate[s] our sense of fundamental fairness or shock[s] the universal sense of justice." *United States v. Pitt*, 193 F.3d 751, 761-62 (3d Cir. 1999). Finally, the Court found the defense of outrageous government conduct was procedurally barred because Whitfield offered no reasons for the failure to raise it prior to trial.

The considerations that led this Court to deny Whitfield's request to dismiss the indictment based on outrageous government conduct apply with equal force to Graham's motion. The Court recognizes that, unlike Whitfield, Graham was not the target of the sting operation and was unknown to ATF until the day of the robbery. Although the Government thus had no information about Graham's criminal history or reason to suspect he had any prior involvement in home invasion robberies, it was Whitfield, not the Government, who brought Graham into the conspiracy. As the Ninth Circuit recognized in affirming the denial of a motion to dismiss for outrageous government conduct in connection with a similar ATF reverse-sting operation in *United States v. Black*, the question presented by such a motion "is whether the *government's* conduct was outrageous in conducting th[e] criminal investigation." 733 F.3d 294, 307 n.11 (9th Cir. 2013). Thus, "[a]s long as the government's investigation was initiated and performed

tolerably with respect to the operation as a whole," its conduct does not become outrageous "merely because an individual with no known criminal history whom the government did not suspect of criminal activity joined the criminal enterprise at the last minute at the behest of codefendants." *Id.*

In this case, although ATF's representation that there would be two individuals guarding the cocaine, one of whom would be armed, may have necessitated the involvement of other robbers beyond Whitfield himself, there is no evidence the undercover agent pressured Whitfield to use more than the three-person crew Whitfield himself initially proposed. *Cf. id.* (suggesting it might be appropriate to evaluate the outrageousness of the government's conduct separately as to each defendant "[i]f there were evidence that the government purposely and unnecessarily coerced additional individuals to join the operation (as opposed to those individuals joining at the behest of coconspirators)"). Moreover, in discussing the robbery with Whitfield during their initial meeting on June 27, 2012, the undercover agent made clear he did not want any "young boys," i.e., that he was looking for a professional robbery crew—"people[] who know what they're doing and . . . do this for a living"—as opposed to teenagers or opportunists or people off the street. *See* Trial Tr. 2.115-2.116, May 14, 2013; Trial Tr. 3.94-3.96, 3.112-3.113, May 15, 2013; Gov't's Ex. 81A at 5, 12. Whitfield assured the agent his associates were not "young boys." *See* Trial Tr. 3.112, May 14, 2013; Gov't's Ex. 81A at 12. And, on the morning of the robbery, Graham himself told the agent this was not his "first time," which the agent understood to mean Graham had experience committing robberies. Trial Tr. 4.146-4.147, May 16, 2013; Gov't's Ex. 84A at 22.

It is also significant, as the Government notes, that when Graham showed up at the designated location on the morning of July 18, he was prepared to participate in the conspiracy

before ever having met the undercover agent and needed no Government coercion. Graham brought a gun to the meet-up "in case somebody need it," and two crowbars were recovered from the trunk of his car. Trial Tr. 2.169-2.170, May 14, 2013; Trial Tr. 4.147, May 16, 2013; Gov't's Ex. 84A at 5. He did not express surprise or reluctance when the undercover agent reviewed the robbery scenario with the group, and he participated in the discussion of the robbery plan, adding that the robbers should first go after the younger armed guard upon entering the stash house. *See* Trial Tr. 2.182-2.183, May 14, 2013 (discussing Graham's statement "[t]he young boy with the gat, he just gonna be standing there, gotta get him first"); Gov't's Ex. 84A at 18. While in a car with the undercover agent during the meet-up, Graham also expressed interest in doing another robbery with the agent, stating "[e]verybody making money, everybody cool." *See* Trial Tr. 4.145-4.146, May 16, 2014; Gov't's Ex. 84A at 22. These factors also weigh against a finding of outrageousness in this case.[3] *See United States v. Lakhani*, 480 F.3d 171, 180, 182 (3d Cir. 2007) (finding evidence of defendant's predisposition to commit the offense at issue, including his "ready response" to the government's solicitation, weighed against a finding of outrageousness); *United States v. Barbosa*, 271 F.3d 438, 470, 472 (3d Cir. 2001) (finding defendant's willing participation in a drug conspiracy in which a government informant solicited him to transport a kilogram of heroin from Aruba to the United States by swallowing it weighed

---

[3] The evidence also shows that, like Graham, Kareem Long, who joined Graham's motion, came to the meet-up on July 18 prepared to participate in robbery. Lafayette Rawls, who recruited Long for the robbery, testified he met with Long the day before the robbery and told him the robbery was for twelve "bricks," or kilograms of cocaine. Trial Tr. 6.52-6.53, May 20, 2013. Long said he was "with it," i.e., that he was willing to do it, and then recruited Kenneth Parnell to participate. *Id.* at 6.53-6.54; Trial Tr. 5:294-5.296, May 17, 2013. Although Long did not bring a gun with him on the morning of July 18, he recognized guns would be necessary for the robbery, texting Rawls before the meet-up, "we don't have no guns bro we need to," which Rawls interpreted to mean Long and Parnell needed guns for the robbery. Gov't's Ex. 24O; Trial Tr. 6.69-6.70, May 20, 2013. Once at the meet-up, Long did not express surprise or reluctance when the undercover agent reviewed the robbery scenario.

against a finding of outrageousness); *cf. Twigg*, 588 F.2d at 382 (reversing the conviction of a defendant brought into a drug conspiracy by a fellow conspirator where there was no evidence the defendant knew the ultimate purpose of the conspiracy when he provided assistance initially and where he "contributed nothing in terms of expertise, money, supplies, or ideas" to the venture and "would not even have shared in the proceeds").

For all of these reasons, and for the reasons set forth in this Court's July 8, 2014, Order denying Whitfield's request to dismiss the indictment based on outrageous government conduct (ECF No. 386), the Court is not persuaded that the Government's conduct with respect to the reverse sting operation in this case constitutes the kind of "shocking, outrageous, and clearly intolerable" conduct necessary to establish the "extraordinary defense" of outrageous government conduct.  *See United States v. Nolan-Cooper*, 155 F.3d 221, 230-31 (3d Cir. 1998) (citation omitted).

BY THE COURT:

   /s/ Juan R. Sánchez
Juan R. Sánchez, J.